# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01479-COA

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF FRANCES ANNE MCPHAIL: JUSTIN W. MCPHAIL AND ANTHONY PAGE PORTERA | APPELLANTS |

v.

| | |
|---|---|
| PAMELA MCPHAIL | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 08/18/2015 |
| TRIAL JUDGE: | HON. ROBERT Q. WHITWELL |
| COURT FROM WHICH APPEALED: | CALHOUN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | T. SWAYZE ALFORD |
| | KAYLA FOWLER WARE |
| ATTORNEY FOR APPELLEE: | HAVEN CLANTON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | AWARDED GUARDIANSHIP TO APPELLEE; AWARDED LIBERAL VISITATION WITH FAMILY MEMBERS, WITH NO OVERNIGHT VISITS; AND LIMITED FAMILY TO TAKING WARD OUT OF NURSING HOME ONE NIGHT PER WEEK FOR FINITE PERIOD OF TIME |
| DISPOSITION: | AFFIRMED - 02/28/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE GRIFFIS, P.J., BARNES AND CARLTON, JJ.

### BARNES, J., FOR THE COURT:

¶1. On April 29, 2015, Justin McPhail and Anthony Page Portera (Page) filed a petition with the Calhoun County Chancery Court, requesting to be appointed as guardians of their grandmother, Frances McPhail. At the initiation of the proceedings, Frances was eighty-six years old and a patient at a nursing home in Calhoun City, Mississippi. She had recently

been diagnosed as suffering from dementia.[1] The petition claimed that Frances had executed a durable power of attorney on January 29, 2015, appointing Justin and/or Page and/or Patricia (Patty) Hibbard, Frances's daughter and Page's mother, as her attorney-in-fact. The petition also argued that it would be in Frances's best interest to reside with her granddaughter, Enga Wooten, in Long Beach, Mississippi.[2]

¶2. Before going into the nursing home, Frances had lived in her house with her other daughter, Pamela McPhail (Pam), for approximately twenty years.[3] Pam answered the petition for guardianship, raising several affirmative defenses and claiming that Justin and Page (collectively referred to as Appellants) were unfit to serve as Frances's guardians. She further argued Frances was not capable of managing her own affairs when she signed the durable power of attorney on January 29, 2015, and noted that a prior power of attorney dated January 2, 2007, appointing Pam and/or Wayne McPhail, Frances's son, as attorney-in-fact, was in full force and effect. Pam also objected to the appointment of a guardian, contending that because she was the "duly appointed attorney of her mother[, she] ha[d] been able to

---

[1] Frances was later moved to Golden Living Nursing Home in Eupora, Mississippi.

[2] Justin resides in Grenada, Mississippi. His father, Wayne McPhail, is Frances's only son. Page and Patty, his mother, live in Long Beach. Justin later acknowledged that after some contentious interactions with other family members, Enga had changed her mind and did not wish for Frances to reside with her.

[3] Pam moved back home with her mother in 1996 to help care for Pam's father, who had cancer. After his death, she continued to live with Frances; she is employed as a school teacher in Calhoun City. In 2003, Frances transferred the warranty deed for the real estate to Pam, but in 2006, Pam conveyed a life estate for the property to Frances.

completely care for her mother's health needs and her business affairs by utilizing the authority granted unto her[.]" Alternatively, she argued that, if the chancery court determined a guardian was needed, she was the "proper person for the appointment."

¶3. On May 20, 2015, the parties entered into an "Agreed Order of Continuance and Resetting," which included temporary visitation rights for family members to take Frances from the premises of the nursing home for short periods of time, with Pam to receive four hours' notice before the visit when possible. The order also allowed family to take Frances and leave the nursing home for up to forty-eight hours, two times a month. Pam was to receive forty-eight hours' notice before any overnight visits.

¶4. Pam filed a motion for contempt and for a temporary restraining order (TRO) on July 10, 2015, alleging Justin had willfully failed to comply with the May 21, 2015 order. The motion claimed that Justin had picked up Frances from the nursing home on July 2, 2015, and failed to return her that evening. Although he informed nursing-home staff the next day that he would return Frances by noon, he appeared later that afternoon without Frances and told the staff that he was keeping her all weekend. Pam received no notice of this visit. On July 6, Justin told the nursing-home supervisor he would not bring Frances back until the court hearing scheduled for August 18, 2015, and he did not reveal her whereabouts.[4] It was later discovered that Justin took Frances to the Mississippi Gulf Coast and left her with family.

---

[4] Pam admitted at the motion hearing that she saw Justin and Frances in Grenada at some point that week, but she was reluctant to confront him directly, testifying that Justin "has an uncontrollable temper."

3

The motion contended that Justin's conduct was "contrary to [Frances's] best mental and physical needs . . . and could jeopardize Medicaid reimbursements for nursing home charges."

¶5. Pam obtained the TRO on July 21, 2015, and was granted legal and physical custody of Frances in order to retrieve her and bring her back to the nursing home. Pam and Wayne drove to Enga's home in Long Beach and retrieved Frances. On August 7, 2015, the chancery court entered an order, dissolving the TRO, finding Justin in contempt, and holding that the May 21, 2015 order should remain in full force and effect. The court imposed no sanctions on Justin, as long he complied with the court's prior order, and it placed no additional restrictions on visitation with Frances at the nursing home.

¶6. A hearing on the petition for guardianship was held on August 18, 2015. In a bench opinion, the chancellor denied the Appellants' petition for guardianship, noting that Justin had two outstanding debts ($43,000 to the Internal Revenue Service and approximately $78,000 to First Security Bank), neither of which had any payment plan or schedule. He also observed that Justin had custody of his son every other week and a busy work schedule. The chancellor set aside the January 29, 2015 power of attorney, as there was no evidence that the prior January 2, 2007 power of attorney, which was executed when Frances "was lucid, in good shape and health[,]" had been revoked. Finding that Frances had diminished mental capacity, the chancellor appointed Pam as her guardian and required Pam to submit annual accountings; he also ordered Pam to remove her name as co-owner of a joint checking

4

account with Frances. The chancellor "reserve[d] the right to amend [his] ruling should [he] make some error in law or fact that is called to [his] attention at a later time."

¶7. On August 29, 2015, the chancery court entered its final order. The court authorized liberal visitation rights with Frances for family members, subject to the nursing home's rules and regulations, and that visitation "shall be on site at the nursing home and shall not extend beyond 10:30 p.m. of any day, *except family members may take Ms. McPhail out of the nursing home for* [*one*] *night during a week for dinner or ice cream, etc.*" (Emphasis added). This italicized language was a handwritten addition subsequently added by the chancellor after counsel met with the court to discuss the order's language concerning visitation. However, no provision was made for any overnight visits.

¶8. The Appellants argue on appeal that the chancellor erred in modifying his bench opinion and in prohibiting overnight visitation in the final judgment. They further contend the court abused its discretion in choosing Pam as Frances's guardian. Finding no error, we affirm.

**STANDARD OF REVIEW**

¶9. Our appellate courts "employ[] a limited standard of review on appeals from chancery court." *Tenn. Props. Inc. v. Gillentine*, 66 So. 3d 695, 697 (¶9) (Miss. Ct. App. 2011) (citing *Corp. Mgmt. v. Greene Cty.,* 23 So. 3d 454, 459 (¶11) (Miss. 2009)). "As such, we will not disturb the factual findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an

erroneous legal standard." *Id.* Questions of law, however, are reviewed de novo. *Id.* (citing *Fletcher v. Lyles,* 999 So. 2d 1271, 1276 (¶20) (Miss. 2009)).

## DISCUSSION

I. **Whether the chancery court's order failed to incorporate its bench ruling.**

¶10. The Appellants argue that the chancery court's final order is prejudicial, as it failed to reflect the court's bench ruling, and should be reversed. At the conclusion of the hearing, the chancellor appointed Pam as guardian of the person and estate of Frances. The chancellor authorized visitation with family members, as long as the visits complied with the rules and regulations of the nursing home where Frances resided. When discussing overnight visits, Justin claimed that Frances could be out of the nursing home for up to fourteen days at a time. The chancellor merely held that it would be whatever the nursing home and Medicaid would allow, but he left it open for modification, stating:

> Well, I tell you what let's do. Y[ou] investigate that and what the nursing home will allow. And if she's able and we can do it, you know, I *might* consider a petition to modify that some. But at this time, I think we need to go with what I've ruled. And I think any more than whatever a day or so, whatever they allow, I think, is based on her condition in my view of the witnesses and so forth. I think that's where we need to be.

(Emphasis added). However, when the order was prepared by counsel, it failed to address the issue of overnight visits. Although the chancellor entered the subsequent handwritten amendment that allowed family members to take Frances out for "dinner or ice cream," nothing in the order indicated that she would be allowed to leave for overnight visits.

6

¶11. "The Mississippi Supreme Court has held that 'a chancellor's bench ruling is not final, but subject to modification by that same chancellor.'" *Hinson v. Hinson*, 877 So. 2d 547, 548 (¶5) (Miss. Ct. App. 2004) (quoting *Grey v. Grey,* 638 So. 2d 488, 492 (Miss. 1994)). As Pam notes, the chancellor's bench opinion "was prefaced with the [c]hancellor['s] reserving the right to amend should he make some error in law or fact that is called to his attention at a later time." Furthermore, the chancellor never explicitly held in his bench opinion that overnight visits would be allowed. Therefore, we find no merit to this argument.

## II. Whether the chancery court erred in limiting visitation.

¶12. Alternatively, the Appellants argue that the chancery court abused its discretion in limiting their visitation with Frances and prohibiting overnight visitation. Pam claims that overnight visitation "disrupts Frances'[s] routine . . . and if executed, would require a re-adjustment by her to the nursing home routine upon each return."

¶13. We find no abuse of discretion in the chancery court's ruling.[5] The court allowed "liberal" visitation with Frances, as long as the visits comply with the rules and regulations of the nursing home. The prohibition of overnight visitation is for Frances's well-being, which was the chancery court's primary concern. As Frances's physician, Dr. Charles Ozborn, testified in his deposition, "it's a big job" to take care of someone in Frances's

---

[5] Although it relates to child custody, this Court has recently held: "Unless we find that a chancery court's determination regarding visitation and its restrictions is manifestly wrong or constitutes an abuse of discretion, we are bound to accept its findings." *Bolivar v. Waltman*, 194 So. 3d 889, 893 (¶6) (Miss. Ct. App. 2016) (citing *Lofton v. Lofton,* 176 So. 3d 1184, 1186 (¶5) (Miss. Ct. App. 2015)).

condition, and she requires twenty-four-hour care. Frances is on several types of medication and, with her dementia, benefits from a structured environment. When asked whether Frances would "fare better" if her schedule were not disrupted, Dr. Ozborn replied, "[T]hat's an obvious yes. . . . [O]ne of the things that's really important is having a schedule."

### III. Whether the chancery court erred in appointing Pamela as guardian.

¶14. The Appellants argue the chancellor erred in appointing Pam as Frances's guardian, contending there was "undisputed evidence at trial that Pam breached her fiduciary duties to Frances over and over again," and they request appointment of Justin as guardian.

¶15. "[T]he purpose of guardianships and conservatorships is to provide an amount of protection to an individual who is, for a variety of reasons, unable fully to protect himself." *In re Guardianship of Estate of Lewis*, 45 So. 3d 313, 318 (¶15) (Miss. Ct. App. 2010). Therefore, "chancery courts generally are given wide discretion to 'take all necessary steps to conserve and protect the best interest of these wards of the court' in determining the appropriate person to be appointed as a conservator." *Ravenstein v. Ravenstein*, 167 So. 3d 210, 220 (¶21) (Miss. 2014) (quoting *Union Chevrolet Co. v. Arrington*, 162 Miss. 816, 826, 132 So. 593, 595 (1932)).

¶16. We find no abuse of discretion in denying the Appellants' petition for guardianship. Justin agreed that Frances needed constant care but presented no specifics as to how he would care for Frances on a twenty-four-hour basis. He also admitted he had significant debt; so the chancellor was concerned about how he could support Frances's care. Justin

testified that he had custody of his son every other week, and his mother acknowledged that she helped him with the child's care when he visited. It was also noted that Enga was no longer agreeable to taking care of Frances, due to the family disagreement with Wayne and Pam. Page further testified that he and his mother, Patty, had recently opened a family-owned restaurant, open Monday through Saturday, and that he usually did not get home until after 10 p.m.

¶17. We also find there was substantial evidence to support the chancellor's appointment of Pam as guardian. In 2006, Frances executed a Last Will and Testament, Power of Attorney, and Medical Power of Attorney, and nominated Pam as her guardian, should one need to be appointed. Frances was determined at that time to be of sound and disposing mind. There was evidence that Pam and Frances had full access to each other's bank accounts, and Pam admitted that she treated the bank accounts as joint accounts, not "yours and mine." But Pam denies that she took advantage of her mother. While the chancellor acknowledged that he "was not happy with the way [Pam] handled the money," he reasoned that Pam had been Frances's "full-time caregiver for over [twenty] years." The two women had a common social life, traveling and shopping together. One of Frances's neighbors, Irma Boland, testified on Pam's behalf:

> Q. And who was taking care of Ms. Frances in these two-and-a-half years when you noticed her health going down.
>
> A. Pam.
>
> Q. Did you see anybody else in the family?

9

A.    No.

. . . .

Q.    When you were visiting in Ms. Frances house, how did Pam treat her mother?

A.    She was very good to her.

. . . .

Q.    Did it appear that Pam was dedicated to the care of her mother?

A.    Yes.

When asked whether he thought Pam was "supportive" of Frances, Dr. Ozborn testified:

> She seems to be. She seems to be very interactive with her. I never saw any dissension between them. But, there again, I've only – her daughter has only been in the room when I've seen her two or three times. Twice, I think over the few months that she's been here, she's been in the room with her when I came around.

Moreover, the chancellor put protections in place to ensure Pam appropriately manages her mother's funds, such as taking Pam's name off the checking account and requiring her to pay her own utilities on the home. He also required Pam to submit an annual accounting.

¶18.    Accordingly, we find no error in the chancery court's decision to appoint Pam as guardian.

¶19.    **THE JUDGMENT OF THE CHANCERY COURT OF CALHOUN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR, WILSON AND WESTBROOKS, JJ., CONCUR. GREENLEE, J., NOT PARTICIPATING.**